**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSALL DIVISION**

| | | |
|---|---|---|
| KOJICAST, LLC, | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION NO. 2:19-cv-00132 |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| FUNIMATION PRODUCTIONS, LLC, | § | |
| | § | |
| Defendant | § | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Kojicast, LLC ("Kojicast") as and for its original complaint for patent infringement against Funimation Productions, LLC ("Defendant" or "Funimation"), alleges as follows:

**THE PARTIES**

1.    Kojicast, LLC is a Texas LLC having a principal place of business at 6220 Bentwood Trail #1705, Dallas, Collin County, Texas 75252.

2.    Upon information and belief, Funimation is a Delaware corporation with its principal place of business located at 1200 Lakeside Parkway, Suite 100, Flower Mound, Texas 75028. (Denton County).

3.    Upon information and belief, Defendant offers products, including those accused herein of infringement, to customers and/or potential customers located in Texas and elsewhere in the United States. Among other things, Defendant engages in marketing activities that promote the use of the Defendant's video delivery platform.

## JURISDICTION AND VENUE

4.      Kojicast brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 et seq. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400. Defendants principal place of business is in this District in Flower Mound, TX (Denton County).





Upon information and belief, Defendant has committed acts of infringement in this judicial district, and/or have purposely transacted business involving the accused products in this judicial district, including sales to one or more customers in the State of Texas.

6.      Defendant is subject to this Court's jurisdiction pursuant to due process and/or the Texas Long Arm Statute due at least to its substantial business in this State and judicial district, including: (A) at least part of its past infringing activities, (B) regularly doing or soliciting business in Texas, and/or (C) engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in Texas.

## THE PATENTS-IN-SUIT

7.      Kojicast is the owner of U.S. Patent No. 9,037,683 ("the '683 Patent"), entitled MEDIA ASSET STREAMING OVER NETWORK TO DEVICES that issued on April 29, 2015 and claims priority to an application filed on March 5, 2012.  The first-listed inventor of the '683 Patent is Koji Yoden of Japan.   A true and correct copy of the '683 Patent is attached as Exhibit A hereto.

8.      Public resources indicate that the U.S. Patent and Trademark Office (USPTO) cited and considered more than seventy (70) references before it determined that the inventions in the Patent-in-Suit deserved patent protection. Among those references include patents and/or patent applications of Apple (ten references), Microsoft, Sony, LG, Comcast, AT&T, and Intel.

9.      The claims of the '683 Patent are novel and non-obviousness.

10.      The '683 Patent is inventive over prior art.

11.      The methods and operational capability recited in the claims of the '683 patent are not conventional or generic.

12.      The '683 Patent addresses a problem whereby a user of a mobile device (e.g., a mobile phone) is streaming media content (e.g., a movie or a video) from a server (e.g., the cloud)

to the mobile phone. However, the user desires to switch the streaming destination and instead stream the same media content (e.g. the movie or the video) from the server to a TV. Conventionally, mobile devices had no ability to select among multiple streaming destinations. Accordingly, the user had to put down the mobile phone (effectively stopping the streaming) and then launch an application on a different device specifically designed to stream content to a TV. These devices are referred to a streaming device and are sold by numerous companies including Amazon, Roku, Apple, Google, and Nvidia.  For example, a user could launch a streaming device connected to the TV. In this process, the user had to hope that he or she could find the same video and, the same streaming service was being used on both the streaming device and the mobile device.

13.     With reference to the preceding paragraph, for example, the user may have been watching a YouTube video (or any other video or audio content) on his or her mobile phone via a mobile device application such as YouTube.  To access the same movie or video through the streaming device (connected to the TV), the user would need to first ensure that a YouTube application was installed on the streaming device and, also, provide sign-in credentials. Then, the user would need to navigate through the on-screen interface on the streaming device to find the same movie or video – hoping that he or she could find it and, ultimately, advance the video to the same spot he or she was previously watching on the mobile phone. If the user decided to switch streaming back to the mobile device instead of streaming through the streaming device to the TV, the opposite complicated steps would occur. The streaming device would stop streaming and the user would need to attempt to find the same movie or video on the mobile phone – again encountering a similar trouble-some process.

14.     The inventor of the '683 Patent, Koji Yoden, recognized that this inability to select amongst streaming destinations and actively switch between the two was cumbersome. Yet, no one had solved the problem of making them less cumbersome. Accordingly, through the teachings of the '683 Patent, Koji Yoden devised a way whereby the mobile phone, server, and TV could all be modified to communicate with one another to allow a user selection amongst multiple destinations thereby, for example, allowing one to switch the streaming of the media content to the mobile device to streaming the same media content to the TV.

15.     Additionally, to make things incredibly easy on the user, Koji Yoden taught in the '683 Patent how to modify the mobile phone, server, and TV to allow control of such interactions directly from the mobile phone. For example, a user could select on a graphical user interface of the mobile phone to switch a streaming to the television. Then, after a user switches streaming to the TV, the mobile phone user maintains control and watches progress information on the mobile phone. This is because the servers were modified to simultaneously send progress information to the mobile phone while, also, streaming content to the TV.

16.     Koji Yoden further taught in the '683 Patent how switching of streaming destinations could occur multiple times from the mobile phone. For example, after switching to the TV, the user via the mobile phone could switch streaming back to the mobile phone or to another TV, for example in the next room.  Such concepts advantageously allowed a user to initially stream a  movie or video to a mobile phone (e.g., during a commute)  and then seamlessly switch to a TV at home directly through the mobile phone. Then, after watching on one TV, the user could further switch to a second TV in the home (or another home) through further interaction on the mobile phone.

17.     Koji Yoden further taught how monitoring of connections between these devices (server, mobile phone, and TV) allowed a ceasing of streaming, for example, when the streaming server could no longer reach the mobile  device.

18.     While new at the time he developed it, Koji Yoden's invention is now generally referred to in the industry as "casting." Rather than simply describe a "pie in the sky" implementation of such invention, Koji Yoden laboriously described in detail in a patent covering ninety-seven (97) pages how these three devices could be modified to allow such a switching and mobile device control. For example, through FIGURES 9-26, 35-40, 43-45, 47-51, 61-62, and 65-66 and the associated text, Koji Yoden explained how these devices (mobile phone, server, and TV) communicate with one another, using what engineers refer to as "call flows" – whereupon arrowed lines represent communicated information back and forth between devices.  In FIGURES 1-5 and associated text, Koji Yoden provided architectural diagrams and further explained the interaction between the mobile phone, server, and TV occur. Additionally, in the remaining figures and associated text, Koji Yoden explained among other things, how the graphical user interface could be used control and switch between different destinations.

19.     In the prosecution of the '683 Patent, Koji Yoden's invention was compared against more than seventy (70) references, including some of the best technological companies in the world. For example, the USPTO examiner compared Koji Yoden's inventions to ten (10) references from Apple and one or more references from Google, Microsoft, Sony, LG, Comcast, AT&T, and Intel.

20.     Through this prosecution, Koji Yoden as a pro-se inventor (representing himself) carefully examined the closest pieces of prior art the United States Patent Office found.  Following

an initial rejection , Koji Yoden cancelled all the claims and presented new claims along with an explanation as to why such prior art did not disclose the claim features:

> However, none of Lee, Klein, and Nakamura discloses: determining one of a mobile device and a media playback device as a streaming destination in response to a user input for selection of one of thumbnails of media contents listed on a mobile device in communication with a server with reference to a database associating the mobile device with the media playback device. In Lee, the

> Also, none of Lee, Klein, and Nakamura discloses: providing progress information on a mobile device in parallel to streaming of a media content from the server to a media playback device, wherein the progress information is indicative of progress of the streaming of the media content directed to the media playback device. In Klein, a progress bar 420 is illustrated in FIG. 4A, but FIG.

February 1, 2015 Office Action response at pages 12 of 15.

21.     After examining Koji Yoden's claims in light of these seventy (70) references, the USPTO decided to allow the application. In exchange for his inventive contribution to society, Koji Yoden was granted the '683 Patent.

22.     The USPTO determined that claims of the '683 Patent were new under 35 U.S.C. §102 et. seq.

23.     The USPTO determined that claims of the '683 Patent were non-obvious under 35 U.S.C. §103 et. seq.

24.     The USPTO determined that claims of the '683 Patent contained patentable subject matter under 35 U.S.C. §101.

25.     The claims of the '683 Patent were examined after the 2014 supreme court decision in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014).

26.     The claims of the '683 Patent reflect the above-described teachings and are directed to the novel concept of enabling a user on a mobile device (e.g., a mobile phone) to switch the streaming of media content from a server (e.g., the cloud) to the mobile device to a streaming from the server to a TV. The claims further recite the novel concept of allowing the user on the mobile device continued interaction in such streaming even though the media content was switched to streamed directly from the server to the TV. For example, in such a scenario, progress information is sent from the server to the mobile device in parallel with the streaming of the media content to the TV.  Further, a user can choose to switch from streaming from the server to the TV to streaming to the mobile device (or another TV) through the mobile device interaction.

27.     No existing computer technology had such functionality. Indeed, the USPTO could find no such disclosures. To enable the functionally of the claims, the specification of the '683 Patent disclosed how streaming servers could be modified to communicate simultaneously with both a TV and a mobile device and, also, switch the streaming between the two.

28.     In the particular context of the claims, each of these respective devices is distinct from the others by an Internet Protocol (IP) address. Accordingly, the server at a first IP address (according to the teaching of the disclosures) were modified to be able to stream media content to a second IP address (e.g., the TV) while simultaneously communicating progress information to a third IP address (e.g., the mobile device). Moreover, the disclosure of the '683 Patent taught how all three of the mobile device, media streaming device (associated with a TV), and the servers could be modified and improved to enable switching between the mobile device and TV as the streaming destination through control by the mobile device.

29.     In other litigation, Google's "Chromecast" and Apple's Airplay were alleged to be prior art.

30.     Google's "Chromecast" is not prior art. Google announced Chromecast in July of 2013 – more than a year after the March 2012 priority date of the '683 Patent. Additionally, the priority dates of Google's patent on its Chromecast devices post-date the invention date. *See* e.g., U.S. Patent No. 10,103,899 (listing provisional application date of June 17, 2013) and U.S. Patent No. D741,865 (listing application date of April 4, 2014).

31.     Apple's Airplay "mirroring" is a completely different technology than that disclosed in the '683 Patent and has not been accused in the present lawsuit. Additionally, to the extent any Apple technology had any relevance to the '683 Patent, the USPTO considered ten references from Apple and found none that disclosed Koji Yoden's invention.

32.     Moreover, Airplay as a technology has evolved over time. For example, Airplay concepts concerning direct streaming from a wireless device to a TV (which has not been accused in this lawsuit ) were still considered to be new more than two years after the March 2012 priority date of the '683 Patent. *See* e.g., U.S. Patent No. 9,665,336 to Qualcomm entitled "Direct Streaming for Wireless Display." (listing a priority date of July 29, 2014).

33.     The '683 Patent also does not pre-empt all methods of streaming. For example, a user may engage in traditional streaming to a mobile phone or traditional streaming to a television – using the cumbersome process that existed before Koji Yoden's invention.

34.     Courts have repeatedly warned against over-simplifying inventions. Koji Yoden's invention is not merely limited to the concept of streaming media content to a media playback device based on user input on a mobile device. Nor is Koji Yoden's invention merely limited to the concept of displaying a progress bar and playback buttons on one device while streaming the video/media on another device. Limiting Koji Yoden's invention to such concepts undeniably ignores the claims.

35.    Had the '683 been examined today, it would likewise again be determined to satisfy the requirements of 35 U.S.C. §§101, 102, and 103.

36.    The claims of the '683 Patent do not simply say "apply it" to an abstract concept. Rather, they describe improvements to computer systems, namely the  particular interactions that occur between different machines with discrete IP addresses.

37.    The USPTO's April 2018 memo to the Patent Examining Corp explained the impact of Federal Circuit's Decision in *Berkheimer v. HP Inc*., 881 F.3d 1360 (Fed. Cir. 2018) and the corresponding required evidence to show something was abstract.  In particular, the USPTO recognized that in the patentable subject matter inquiry, the evidence required more than just a showing that something was disclosed in the prior art. Rather, the evidence must show that something was "well-understood, routine, and conventional."

> Specifically, the Federal Circuit held that "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." Id. at 1369.
>
> . . .
>
> As the Federal Circuit explained: "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." Berkheimer, 881 F.3d at 1369.

**Source**:        https://www.uspto.gov/sites/default/files/documents/memo-berkheimer-20180419.PDF (Emphasis added).

38.    To this end, the USPTO issued training material guidance in April 2018 to its the Patent Examining Corp in the context of a patentable matter subject matter determination – look for something that is "widely prevalent or in common use in the relevant industry."

> – An examiner should conclude that an element (or combination of elements) is well-understood, routine, conventional activity **only** when the examiner can readily conclude that the element(s) is widely prevalent or in common use in the relevant industry, as explained in MPEP § 2106.05(d)(I)
>
> – **NEW:** Conclusion must be based upon factual determinations
>
> 

**Source**: https://www.uspto.gov/sites/default/files/documents/berkheimer-training-20180427.pptx

39.    The claim elements of the '683 Patent are neither "widely prevalent or in common use in the relevant industry" nor are they "well-understood, routine, and conventional." No evidence has been provided showing this to be the case.  Rather, as evidenced by the examination process of the '683 Patent, the features of the claims were not even disclosed by the seventy (70) references already considered.

40.    If indeed something were well-understood, routine, and conventional, certainly evidence could easily be obtained to establish as much.

41.    Claim 1 of the '683 Patent requires:

1.    A method, comprising:
providing, in a computer-readable medium, a database associating a mobile device with one or more media playback devices, wherein the mobile device and the media playback devices are identified by discrete IP addresses on the Internet;
listing thumbnails of media contents stored on a server, on a graphical user interface of the mobile device, based on media content information received from the server in communication with the mobile device over the Internet, wherein the server is identified by a discrete IP address different from the IP addresses of the mobile device and the media playback devices on the Internet;
in response to a first user input on the graphical user interface, determining one of the mobile device and the media playback devices as a streaming destination with reference to the database, wherein the first user input includes selection of one of the listed thumbnails;
(a) upon determining the mobile device to be the streaming destination, streaming a media content corresponding to the selected thumbnail from the server to the mobile device over the Internet while streaming nothing from the server to any of the media playback devices over the Internet, whereas (b) upon determining one of the media playback devices to be the streaming destination, streaming the

media content corresponding to the selected thumbnail from the server to the determined media playback device over the Internet while streaming progress information from the server to the mobile device in parallel to the streaming of the media content, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content; and

(a) playing back the streamed media content on the graphical user interface of the mobile device when the streaming is directed to the mobile device, whereas (b) displaying the progress on the graphical user interface of the mobile device based on the progress information while playing back the streamed media content at the media playback device when the streaming is directed to the media playback device.

42.   Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "in response to a first user input on the graphical user interface, determining one of the mobile device and the media playback devices as a streaming destination with reference to the database, wherein the first user input includes selection of one of the listed thumbnails"; "(a) upon determining the mobile device to be the streaming destination, streaming a media content corresponding to the selected thumbnail from the server to the mobile device over the Internet while streaming nothing from the server to any of the media playback devices over the Internet, whereas (b) upon determining one of the media playback devices to be the streaming destination, streaming the media content corresponding to the selected thumbnail from the server to the determined media playback device over the Internet while streaming progress information from the server to the mobile device in parallel to the streaming of the media content, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content"; and "(a) playing back the streamed media content on the graphical user interface of the mobile device when the streaming is directed to the mobile device, whereas (b) displaying the progress on the graphical user interface of the mobile device based on the progress information while playing back the streamed media

content at the media playback device when the streaming is directed to the media playback device."

43.     The claims of the '683 Patent are not merely focused on a generic display of content, but are rather specifically focused on the way three discrete devices (a server, a mobile device, a media display device) interact with one another. Prior to the '683 Patent, these three devices together did not interact with one another. Accordingly,  inventor Koji Yodi modified their operation to not only improve the way they worked, but also to greatly improve a user's experience. When a user selects the media display device as the streaming destination (as opposed to the mobile phone), the server (at a first IP address) streams the media content to the streaming device (at a second IP address) while also simultaneously streaming progress information to the mobile phone (e.g., at a third IP address). This interoperation allowed control to be maintained at the mobile phone. As further prescribed, the mobile phone user could switch the streaming again from the streaming device (e.g., TV) to either the mobile device or another stream device (e.g., another TV in another room or another house altogether).

44.     Claim 2 of the '683 Patent requires:

2. A method according to claim 1, further comprising:

(a) in response to a second user input on the graphical user interface of the mobile device on which the streamed media content is being played back during the streaming of the media content directed to the mobile device, changing the streaming destination from the mobile device into one of the media playback devices, whereas (b) in response to a third user input on the graphical user interface of the mobile device on which the progress is being displayed during the streaming of the media content directed to the determined media playback device, changing the streaming destination from the determined media playback device into one of the mobile device and media playback devices other than the determined media playback device.

45.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel,

did not disclose in a well-understood, routine, and conventional manner "(a) in response to a second user input on the graphical user interface of the mobile device on which the streamed media content is being played back during the streaming of the media content directed to the mobile device, changing the streaming destination from the mobile device into one of the media playback devices" and "whereas (b) in response to a third user input on the graphical user interface of the mobile device on which the progress is being displayed during the streaming of the media content directed to the determined media playback device, changing the streaming destination from the determined media playback device into one of the mobile device and media playback devices other than the determined media playback device."

46.     Claim 2 more particularly is directed to a scenario where two switches are prescribed (in addition to a selection from independent Claim 1).  In particular, media content originally being streamed to a mobile device is first switched to being streamed to a media playback device (e.g., a TV) in response to a second user input.  Then, with a third user input, a second switch is made to either the mobile device or another media playback device that is different than the previous determined media playback device. Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

47.     Claim 3 of the '683 Patent requires:

3. A method according to claim 2, wherein the changing the streaming destination in response to the third user input includes:
listing media playback devices other than the determined media playback device in the database, on the graphical user interface of the mobile device; and
in response to selection of one of the listed media playback devices, determining the selected media playback device to be the streaming destination.

48.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "listing media playback

devices other than the determined media playback device in the database, on the graphical user interface of the mobile device" and "in response to selection of one of the listed media playback devices, determining the selected media playback device to be the streaming destination."

49.     Claim 3 more particularly is directed to a scenario where two media playback devices (e.g., connected to TVs) are prescribed.  For example, one media playback device may be located in one room and another in another room. From a mobile phone, the user can change from the first to the second by selecting a list that is provided on the mobile phone. Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

50.     Claim 6 of the '683 Patent requires:

> 6. A method according to claim 1, further comprising:
> during the streaming of the media content directed to the media playback device, continuously monitoring communication between the mobile device and the server; and
> in response to determining that the communication is not active between the mobile device and the server over the Internet as a result of the continuous monitoring, stopping the streaming of the media content directed to the media playback device as well as stopping the streaming of the progress information directed to the mobile device.

51.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "during the streaming of the media content directed to the media playback device, continuously monitoring communication between the mobile device and the server" and "during the streaming of the media content directed to the media playback device, continuously monitoring communication between the mobile device and the server."

52.     Claim 6 is more particularly directed to a scenario where media is streamed to a TV, but continuous monitoring occurs between a mobile device and the server.  If communication between the mobile device and the server is not active, two types of communication are ceased: streaming of the media content directed to the media playback device as well as stopping the streaming of the progress information directed to the mobile device. Conventional technologies did not disclose such concepts in a well-understood, routine, and conventional manner.

53.     Claim 7 of the '683 Patent requires:

> 7. A method according to claim 1, further comprising:
> during the streaming of the media content directed to the media playback device, continuously monitoring communication between the media playback device and the server; and
> in response to determining that the communication is not active between the media playback device and the server over the Internet as a result of the continuous monitoring, stopping the streaming of the media content directed to the media playback device as well as stopping the streaming of the progress information directed to the mobile device, and then changing the streaming destination from the media playback device into the mobile device.

54.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "during the streaming of the media content directed to the media playback device, continuously monitoring communication between the media playback device and the server" and "in response to determining that the communication is not active between the media playback device and the server over the Internet as a result of the continuous monitoring, stopping the streaming of the media content directed to the media playback device as well as stopping the streaming of the progress information directed to the mobile device, and then changing the streaming destination from the media playback device into the mobile device.".

55.     Claim 7 is more particularly is directed to a scenario where media is streamed to a TV and continuous monitoring occurs between the TV and the server.  If communication between the TV and the server is not active, the streaming to the TV is ceased and the streaming destination is changed to the mobile device. Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

56.     Claim 9 of the '683 Patent requires:

9. A computer product embodied on a non-transitory computer-readable medium, the computer program product including instructions which, when executed by a processor of a mobile device, cause the mobile device to perform operations comprising:

holding, in a memory of the mobile device, a database associating a mobile device with one or more media playback devices, wherein the mobile device and the media playback devices are identified by discrete IP addresses on the Internet;

listing thumbnails of media contents stored on a server, on a graphical user interface, based on media content information received from the server in communication with the mobile device, wherein the server is identified by a discrete IP address different from the IP addresses of the mobile device and the media playback devices on the Internet; receiving a first user input on the graphical user interface, wherein the first user input including selection of one of the listed thumbnails;

in response to the first user input, determining one of the mobile device and the media playback devices as a streaming destination with reference to the database, wherein the first user input includes selection of one of the listed thumbnails;

(a) upon determining the mobile device to be the streaming destination, requesting the server to direct streaming of a media content corresponding to the selected thumbnail to the mobile device, so as to cause the server to stream the media content to the mobile device over the Internet while streaming nothing to any of the media playback devices over the Internet, whereas (b) upon determining one of the media playback devices to be the streaming destination, requesting the server to direct streaming of the media content to the determined media playback device, so as to cause the server to stream the media content to the determined media playback device over the Internet while streaming progress information to the mobile device in parallel to the streaming of the media content, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content; and

(a) playing back the streamed media content on the graphical user interface when the streaming is directed to the mobile device, whereas (b) displaying the progress on the graphical user interface based on the progress information when the streaming is directed to the media playback device.

57.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel,

did not disclose in a well-understood, routine, and conventional manner "in response to the first user input, determining one of the mobile device and the media playback devices as a streaming destination with reference to the database, wherein the first user input includes selection of one of the listed thumbnails";  "(a) upon determining the mobile device to be the streaming destination, requesting the server to direct streaming of a media content corresponding to the selected thumbnail to the mobile device, so as to cause the server to stream the media content to the mobile device over the Internet while streaming nothing to any of the media playback devices over the Internet, whereas (b) upon determining one of the media playback devices to be the streaming destination, requesting the server to direct streaming of the media content to the determined media playback device, so as to cause the server to stream the media content to the determined media playback device over the Internet while streaming progress information to the mobile device in parallel to the streaming of the media content, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content"; and "(a) playing back the streamed media content on the graphical user  interface when the streaming is directed to the mobile device, whereas (b) displaying the progress on the graphical user interface based on the progress information when the streaming is directed to the media playback device. "in response to determining that the communication is not active between the media playback device and the server over the Internet as a result of the continuous monitoring, stopping the streaming of the media content directed to the media playback device as well as stopping the streaming of the progress information directed to the mobile device, and then changing the streaming destination from the media playback device into the mobile device."

58.    Claim 12 of the '683 Patent requires:

12. A computer program product according to claim 9, wherein the operations further comprise:

(a) in response to a second user input on the graphical user interface on which the streamed media content is being played back during the streaming of the media content directed to the mobile device, changing the streaming destination from the mobile device into one of the media playback devices, whereas (b) in response to a third user input on the graphical user interface on which the progress is being displayed during the streaming of the media content directed to the determined media playback device, changing the streaming destination from the determined media playback device into one of the mobile device and media playback devices other than the determined media playback device.

59. Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "(a) in response to a second user input on the graphical user interface on which the streamed media content is being played back during the streaming of the media content directed to the mobile device, changing the streaming destination from the mobile device into one of the media playback devices," and "(b) in response to a third user input on the graphical user interface on which the progress is being displayed during the streaming of the media content directed to the determined media playback device, changing the streaming destination from the determined media playback device into one of the mobile device and media playback devices other than the determined media playback device."

60. Claim 12 more particularly is directed to a scenario where two switches are prescribed (in addition to a selection from independent Claim 1). In particular, media content originally being streamed to a mobile device is first switched to being streamed to a media playback device (e.g., a TV) in response to a second user input. Then, with a third user input, a second switch is made to either the mobile device or another media playback device that is different than the previous determined media playback device. Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

61.     Claim 13 of the '683 Patent requires:

13. A computer program product according to claim 12, wherein the changing the streaming destination in response to the third user input includes:
listing media playback devices other than the determined media playback device in the database, on the graphical user interface; and
in response to selection of one of the listed media playback devices, determining the selected media playback device to be the streaming destination.

62.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "listing media playback devices other than the determined media playback device in the database, on the graphical user interface" and "in response to selection of one of the listed media playback devices, determining the selected media playback device to be the streaming destination."

63.     Claim 13 more particularly is directed to a scenario where two media playback (e.g., connected to TVs) are prescribed.  For example, one media playback device may be located in one room and another in another room. From a mobile phone, the user can change from the first to the second by selecting a list that is provided on the mobile phone. Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

64.     Claim 16 of the '683 Patent requires:

16.     A media playback device, comprising:
communication circuitry;
a processor; and
a memory storing a computer program including instructions which, when executed by the processor, cause the media playback device to perform operations comprising:
receiving a streaming request from a mobile device identified by an IP address different from an IP address of the media playback device, through the communication circuitry wherein the streaming request is generated by the mobile device following the steps of:

listing thumbnails of media contents stored on a server, on a graphical user interface of the mobile device, based on media content information received from the server in communication with the mobile device, wherein the server is identified by an IP address different from the IP addresses of the mobile device and the media playback device; and

in response to a user input made on the graphical user interface wherein the user input includes selection of one of the listed thumbnails, generating the streaming request for streaming of a media content corresponding to the selected thumbnail;

in response to the reception of the streaming request, establishing Internet connection with the server through the communication circuitry;

requesting the server for streaming of the media content via the established connection;

playing back the media content streamed from the server in response to the request; and

in parallel to the playback of the media content, forwarding progress information to the mobile device through the communication circuitry, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content.

65.    Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "receiving a streaming request from a mobile device identified by an IP address different from an IP address of the media playback device"; "in response to a user input made on the graphical user interface wherein the user input includes selection of one of the listed thumbnails, generating the streaming request for streaming of a media content corresponding to the selected thumbnail"; "playing back the media content streamed from the server in response to the request" and "in parallel to the playback of the media content, forwarding progress information to the mobile device through the communication circuitry, wherein the progress information is indicative of progress of the streaming of the media content within a duration of the media content."

66.    Claim 17 of the '683 Patent requires:

17. A media playback device according to claim 16, further comprising:

during the playback of the streamed media content, continuously monitoring communication with the mobile device through the communication circuitry; and

in response to determining that the communication is not active with the mobile device through the communication circuitry, stopping the playback of the streamed media content.

67.     Conventional technologies, including those encountered during the prosecution history from companies such as Google, Apple, Microsoft, Sony, LG, Comcast, AT&T, and Intel, did not disclose in a well-understood, routine, and conventional manner "during the playback of the streamed media content, continuously monitoring communication with the mobile device through the communication circuitry" and "in response to determining that the communication is not active with the mobile device through the communication circuitry, stopping the playback of the streamed media content."

68.     Claim 17 is more particularly is directed to a scenario where media is streamed to a TV and continuous monitoring occurs between the TV and the mobile device.  If communication is not active, the streaming to the TV is ceased.  Conventional technologies do not disclose such concepts in a well-understood, routine, and conventional manner.

## **COUNT I**
### (INFRINGEMENT OF U.S. PATENT NO. 9,037,683)

69.     Kojicast incorporates by reference the above paragraphs.

70.     Defendant has marketed its video delivery platform under its brand name "FunimationNow," as well as possibly other brand names.  The following is a discussion of the accused FunimationNow system. The FunimationNow system has apps for mobile communication devices, including an app for Apple IOS operating systems and an app for Android operating systems. The FunimationNow app supports casting features, enabling a user to watch a selected

media content item on the mobile communication device or "casted" to one or more media playback devices.

71.    Defendant has directly infringed, and continues to directly infringe one or more claims of the '683 Patent, including at least Claims 1-3, 6-7, 9, 12-13, and 16-17 ("Asserted Claims"), in this judicial district and elsewhere in Texas, literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling one or more versions of the accused systems during the pendency of the '683 Patent.

72.    In addition, should the accused systems be found to not literally infringe the claims of the '683 Patent, the accused systems would nevertheless still infringe one or more claims of the '683 Patent, including at least the Asserted Claims, under the doctrine of equivalents.  More specifically, the accused system performs substantially the same function (providing alternative viewing screens for viewing media content), in substantially the same way (via a software switch on a mobile phone) to yield substantially the same result (a changeable view of a streamed media content). Defendant would thus be liable for direct infringement under the doctrine of equivalents.

73.    Defendant has also indirectly infringed and continues to indirectly infringe one or more claims of the '683 Patent, including at least the Asserted Claims, in this judicial district and elsewhere in the Texas by, among other things, actively inducing the using, offering for sale, selling, and/or importing Defendant's systems. Defendant's customers who purchase and use such Defendant's app directly infringe one or more of the above identified claims of the '683 Patent in violation of 35 U.S.C. § 271.  Defendant directly and/or indirectly intentionally instructs its customers to infringe through training videos, demonstrations, brochures, installation and/or user guides such as those located at one or more of the following:

- https://www.youtube.com/watch?v=VNQ2ctoFdAw

- https://itunes.apple.com/us/app/funimationnow/id1075603018?mt=8
- https://play.google.com/store/apps/details?id=com.Funimation.FunimationNow&hl=en_US
- https://www.funimation.com/forum/topic/10476/funimationnow-mobile-app-chromecast-issues-and-feedback/10
-

74.     Defendant also indirectly infringed and continues to indirectly infringe one or more claims of the '683 Patent, including at least the Asserted Claims, in this judicial district and elsewhere in the Texas by, among other things, contributing to the direct infringement by others including, without limitation customers use the accused systems, by making, offering to sell, selling and/or importing into the United States, a component of a patented machine, manufacture or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringing the '683 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use.

75.     For example, the accused systems are a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patent process. Furthermore, the system is a material part of the claimed inventions and upon information and belief is not a staple article or commodity of commerce suitable for substantial noninfringing use. Defendant is therefore, liable for infringement under 35 U.S.C. § 271(c).

76.     Defendant is on notice of the '683 Patent since, at the latest, the service of the original complaint. By the time of trial, Defendant will have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of one or more claims of the '683 Patent, including at least the Asserted Claims.

77.     Defendant may have infringed the '683 Patent through other products, currently unknown to Kojicast, utilizing the same or reasonably similar functionality, including other

versions of the accused systems. Kojicast reserves the right to discover and pursue all such additional infringing products.

78.     Kojicast has been damaged by Defendant's infringement of the '683 Patent.

## PRAYER FOR RELIEF

Kojicast requests that the Court enter judgment against Defendant as follows:

(A)     that Defendant have infringed the '683 Patent;

(B)     awarding Kojicast its damages suffered as a result of Defendant's infringement of the '683 Patent pursuant to 35 U.S.C. § 284;

(C)     enjoining Defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries and parents, and all others acting in concert or privity with it from infringing the '683 Patent pursuant to 35 U.S.C. § 283;

(D)     awarding Kojicast its costs, attorneys' fees, expenses and interest; and

(E)     granting Kojicast such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Kojicast hereby demands trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated: April 24, 2019                        Respectfully submitted,

*/s/ James L. Etheridge*

James L. Etheridge
Texas State Bar No. 24059147
Ryan S. Loveless
Texas State Bar No. 24036997
Brett A. Mangrum
Texas State Bar No. 24065671
Travis L. Richins
Texas State Bar No. 24061296
Jeffrey Huang
ETHERIDGE LAW GROUP, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, Texas 76092
Telephone: (817) 470-7249
Facsimile: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jeff@EtheridgeLaw.com

***Counsel for Plaintiff Kojicast***